AMERICAN PIONEER LIFE INSURANCE
COMPANY *v.* JEAN TURMAN, ADMINISTRATRIX OF
THE ESTATE OF WILLIAM H. ADAMS, DECEASED

5-6179                                                    495 S.W. 2d 866

Opinion delivered May 14, 1973

*Frierson, Walker, Snellgrove & Laser,* for appellant.

*Pearson & Parker,* for appellee.

J. FRED JONES, Justice. This is an appeal by American
Pioneer Life Insurance Company, hereinafter called Am-
erican, from a circuit court judgment in favor of Jean Tur-
man, administratrix of the estate of William H. Adams,
in a suit by the administratrix to recover on a credit life
insurance certificate issued on the life of Adams.

The facts appear as follows: Mr. Adams was engaged
in the business of farming and did business with the

Mercantile Bank of Jonesboro. American had issued to the bank a master policy of group credit life insurance insuring the bank against nonpayment of loans made by the bank to its customers. Under the terms of the master policy the bank was authorized to issue certificates of insurance to individual borrowers on printed forms furnished by American. American also furnished to the bank printed "proofs of death" forms in duplicate; one was to be filled out and signed by the claimant, and the other was to be filled out and signed by the attending physician. In the process of making and insuring a loan, the bank would charge and collect an insurance premium from the borrower, then deduct its agent's commission from the premium and deposit the remainder to the account of American. In other words, the bank made loans to customers and then, as agent for American, it sold life insurance to the borrowing customers in the amount of the loan with death benefits payable to the bank.

On February 16, 1971, Mr. Adams obtained a crop loan from the bank in the amount of $4,750 for a period of 12 months, and a certificate of insurance was issued insuring his life in the amount of the loan for a period of 12 months with the bank as beneficiary. In accepting the certificate of life insurance, Mr. Adams signed a provision on the certificate representing that on that date he was in good and sound health. On April 26, 1971, Mr. Adams died as a result of stomach cancer and on June 16, 1971, the bank made claim against American for the insurance proceeds and submitted "proofs of death" forms completed and signed by its vice-president for the claimant bank and by Dr. H. W. Keisker as Mr. Adams' attending physician. American refused to pay the bank contending that Mr. Adams falsely represented in the certificate that he was in good and sound health when the certificate was issued, and for that reason the insurance on the life of Mr. Adams was ineffective.

The loan to Adams was evidenced by a promissory note co-signed by his son who farmed with him. After Mr. Adams' death and American had denied the claim made by the bank, the widow of Mr. Adams repaid the bank loan, and his daughter, as administratrix of his estate, filed suit against American claiming the full face

value of the insurance for the estate as secondary beneficiary. At the close of the evidence before the jury, both sides moved for a directed verdict, whereupon the trial court dismissed the jury and tried the case as to the facts and the law. The trial court rendered judgment in favor of the administratrix of the Adams estate in the amount of $4,750 together with costs, penalty and attorney's fees.

On appeal to this court American contends that the trial court erred in denying its motion for a directed verdict, and that the trial court erred in refusing to receive in evidence the certificate of the attending physician filed as a part of the proofs of death.

In the complaint filed by the administratrix a copy of the insurance certificate was attached and the complaint alleged the issuance of the policy and certificate with the bank as beneficiary, but providing that if the indebtedness to the bank had been paid the beneficiary should be the estate of the insured. The complaint then alleged that American promised to pay $4,750 if the insured should die within a period of 12 months from the date of the application. Paragraph 4 of the complaint alleged that on April 26, 1971, while the policy was in effect, Mr. Adams died under such circumstances as to come within the promises and undertakings of the policy, and to render American liable to pay to the plaintiff as beneficiary the sum of $4,750. The complaint then alleged that proof of death was filed with American by Carey Smith, Vice President of the bank, and American refused to pay the claim.

In American's answer it narrowed the issues to some extent by admitting all the allegations in the complaint except those in paragraph 4. As affirmative defense American alleged as follows:

"Defendant states that the policy of insurance sued upon was procured by the insured, William H. Adams, by means of a false and fraudulent misrepresentation of the state of his health in that the insured in his application stated that 'I am in good and sound health,' which statement was knowingly false in that the applicant was then suffering from cancer which caused

his death less than three months· after the date of issuance of the policy, for which disease he had previously undergone surgery and was then taking medication and was under the treatment of a physician. The policy was issued by the defendant in reliance upon the said representations, which were knowingly false and made by the insured with knowledge of their falsity. As a result thereof, the said policy was void."

As soon as the issues were thus joined, the appellee served notice on the appellant that she would claim the medical privilege under Ark. Stat. Ann. § 28-607 (Repl. 1962).

The certificate issued on the life of Mr. Adams certified that under and subject to the terms and conditions of the master policy issued to the bank, Mr. Adams was insured "subject to the terms and conditions listed on the reverse side of this certificate and these terms and conditions are a part hereof as fully as if set forth on the face of this certificate." The face of the certificate then contained the following pertinent provision over Mr. Adams' signature:

"INSURED MUST SIGN BELOW IF THIS CERTIFICATE IS FOR $1,000.00 OR MORE

I accept the above certificate and the terms of the Master Group Credit Life Insurance Policy under which it is being issued and represent that on the date hereof I am in good and sound health and that a copy of this certificate has been this day delivered to me, and that on the date hereof I was indebted to the above named Creditor in an amount at least equal to the amount of insurance provided herein; and that group credit life insurance, including this certificate, in excess of $10,000.00 is not now in force on my life; and that I am now gainfully employed."

The back side of the certificate bore language in part as follows:

". . . If the person whose life is insured by this Certificate was not in good and sound health on the date hereof, the Company shall be liable only for the return of the premium paid hereon. * * *

Upon discharge of the indebtedness by prepayment, renewal, refinancing or otherwise, the insurance shall be terminated. In all cases of termination prior to scheduled maturity, a refund of any unearned amount paid by or charged to the debtor for insurance shall be made as follows. . . ."

Before the jury was discharged in response to the motions for directed verdicts, the trial court sustained the administratrix's objections to the introduction into evidence of the master policy, the claimant bank's statement in proof of death, and the doctor's statement in proof of death. The death certificate was placed in evidence without objection.

Dr. Keisker signed the death certificate setting out the immediate cause of death as intestinal obstruction of three weeks duration due to generalized abdominal metastasis of unknown duration caused by adenocarcinoma of the stomach of 29 months duration. The death certificate also showed that Dr. Keisker attended Mr. Adams from January 27, 1969, to April 26, 1971, and last saw him alive on April 25, 1971. The physician's statement signed by Dr. H. W. Keisker as a part of the proof of death but excluded from the evidence at the trial, stated that Mr. Adams died in St. Bernard Hospital in Jonesboro on April 26, 1971; that the immediate cause of death was intestinal obstruction which had existed for two weeks; that the date of onset of the first symptom or sign according to the clinical history was April 1, 1971, and the contributory cause of death was adenocarcinoma of the stomach which had existed for two years. In the physician's statement under a request for particulars of each condition for which Mr. Adams was treated or advised prior to his last illness, Dr. Keisker stated that the disease or condition was adenocarcinoma of the stomach, first treated in January, 1969, and treated for a period of two years resulting in good palliation.

It was stipulated by the parties that Mr. Adams was attended by Dr. Keisker on February 18, 1969, February 19, 1969, March 26, 1969, and six more times during the next two years including February 22, 1971, March 22, 1971, and March 14, 1971, when he was admitted to the hospital in his terminal illness.

The record indicates that there may have been some in-chambers proceedings of which no record was made, but it appears that the administratrix was attempting to hold and restrict American to proof of actionable and knowledgeable fraud under its affirmative defense allegations, and at the same time deny American access to the testimony of Dr. Keisker, the only available witness who would know and could testify as to the *extent* of Mr. Adams' knowledge of his condition when he stated he was in good and sound health. The record further indicates that because of limitations in its affirmative plea, American was restricted by the trial court in attempting to prove that Mr. Adams' false statement was material to the acceptance of the risk or the hazard assumed, and that the certificate would not have been issued had the true facts been known.

Mr. Tice, secretary of American, testified that the certificate would not have been issued if Mr. Adams had not signed the statement that he was in good health.

"Q. Mr. Tice, when we were interrupted, I started to ask you about the practice of the company. Now, in this certificate of insurance, which is Exhibit A, is the statement 'I represent on the date hereof I am in good and sound health.' Did the company rely on that statement to issue this certificate?

A. Yes.

Q. I believe you have already testified that was a requirement before they would issue the certificate?

A. Yes, sir.

Q. If it had not been signed, that would not have been issued?

A. That is correct, sir."

The master policy was tendered in evidence under offer of proof. It contains separate right of cancellation and incontestable provision as follows:

## " RIGHT OF CANCELLATION

The Company may cancel the insurance on the life of any Borrower five (5) days after written notice has been mailed the Creditor; however, the Company cannot cancel the Certificate after it has been in force for a period of sixty (60) days unless it is found to have been issued based upon fraudulent information.

## INCONTESTABLE PROVISION

This Policy shall be incontestable; except for nonpayment of premiums after it has been in force for a period of two (2) years from its date of issue, and any Certificate issued hereunder shall be incontestable, except for non-payment of premiums after it has been in force for a period of two (2) years during the Certificate holder's lifetime."

The complaint alleged that the policy was in effect at the time of Mr. Adams' death and there is no contention that there was ever any effort made to cancel it. Mr. Tice testified on direct examination as follows:

"Q. . . . [A]t any time within sixty days after you received that certificate, you might have canceled that policy on five days notice? Is that correct?

A. Yes, sir."

And on cross-examination he testified as follows:

"Q. Mr. Tice, the policy has not been canceled as of this date, has it? The five days notice to the insured, so forth. It never has been canceled, has it?

A. No, sir."

It is obvious, of course, that had American honored the bank's claim when its statement and proofs of death were filed, the bank would have been obligated to apply the amount of the insurance on the debt owed by Mr. Adams, and to have paid any excess over to Mr. Adams' estate. It is also obvious that had the bank filed suit to

recover under the policy, the medical privilege would not have been available to it under § 28-607, *supra,* American offered into evidence the proof of death statement made by Dr. Keisker in support of its allegations that Mr. Adams knowingly and intentionally falsified the state of his health in procuring the insurance coverage. American also contended that the true state of Mr. Adams' health was material to the acceptance of the risk and hazards assumed, and that the certificate would not have been issued if the true facts had been known. The administratrix successfully invoked the medical privilege in opposition to the doctor's statement and contended that American had not pleaded materiality under Ark. Stat. Ann. § 66-3208 (b) (Repl. 1966). Section 66-3208 is as follows:

"(1) All statements in any application for a life or disability insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract in as large an amount or at the same premium or rate, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

(2) If, in any action to rescind any policy or contract or to recover thereon, any misrepresentation with respect to a medical impairment is proved by the insurer, and the insured or any other person having or claiming a right under the contract, shall prevent full disclosure and proof of the nature of the medical impairment, the misrepresentation shall be presumed to have been material."

The certificate of insurance was made an exhibit to the complaint by the appellee in this case and was also offered in evidence by the appellant and received without objection. The loan officer of the bank, Mr. Gairhan, was called as a witness for the appellee and on cross-examination he read from the certificate as follows:

" 'If the person whose life is insured by this certificate was not in good and sound health on the date hereof, the company shall be liable only for the return of the premium hereon.' "

Mr. Gairhan also testified that he was present when Mr. Adams signed the statement on the certificate and when Mr. Adams was asked about the state of his health, "he said he was all right."

It is clear that the insurance involved in this case was primarily for the purpose of paying Mr. Adams' debt to the bank in the event of his death before the debt was paid. No medical examination was required but only the signed statement of Mr. Adams stating that he was in good and sound health when the certificate was issued was all that was required. It is also clear that Mr. Adams was not in good and sound health when he signed the statement and the certificate was issued. According to the death certificate, Mr. Adams had been under treatment for cancer of the stomach by Dr. Keisker for a period of 29 months when he signed the statement that he was in good and sound health.

The appellee argues that the appellant did not plead that the state of Mr. Adams' health was material to the risk and that the appellant in good faith would not have issued the certificate had it known the true facts. The appellee argues that the appellant relied solely on its affirmative defense that Mr. Adams knowingly and fraudulently signed the false statement that he was in good health, and argues that the appellant failed to prove the fraud it alleged. We agree that the appellant failed to prove the *extent* of Mr. Adams' *knowledge* as to the state of his health when he signed the statement, but Dr. Keisker was the only available witness who would have known the extent of Mr. Adams' knowledge as to the exact con-

dition of his health and Dr. Keisker was prevented from testifying by action of the appellee in invoking the medical privilege.

The appellant did allege in its answer that the "policy" was issued in reliance upon said false representations and as a result thereof the policy was void, and Mr. Tice testified that it would not have been issued had Mr. Adams not signed the statement he did sign. Certainly the appellee could not have been taken by surprise at appellant's attempt to prove Mr. Adams' untrue statements material to the acceptance of the risk or to the hazard assumed by the insurer.

We do not agree with appellee's theory that the appellant's failure to allege materiality, etc. under subsections (b) and (c) of § 66-3208, *supra,* was fatal to its defense. There is no question that the statement signed by Mr. Adams was a misrepresentation with respect to a medical impairment, and there is no question that the appellee prevented a full disclosure and proof of the medical impairment by the exercise of the medical privilege. Consequently, subsection (2) of the above statute creates a presumption that the misrepresentation was material and the appellee offered no evidence in rebuttal to that presumption.

In *Union Life Ins.* v. *Davis, Adm'x,* 247 Ark. 1054, 449 S.W. 2d 192, the suit was in chancery for specific performance under a credit life insurance master policy containing "good and sound health" clauses and the defense was based on misrepresentation of true condition of health. The pleadings or medical testimony was not questioned in that case but after setting out subsections (a), (b) and (c) of § 66-3208, *supra,* we concluded that opinion as follows:

> "We have held that materiality to the risk is a question of fact so long as the matter is debatable, but a question of law when so obvious that a contrary inference is not permissible. *Old Republic Ins. Co.* v. *Alexander,* 245 Ark. 1029, 436 S.W. 2d 829. The circumstances of this case are such that we do not feel that an inference that Davis' condition was not material to the risk could properly be drawn."

In 46 C.J.S. § 1294, p. 346, is found the following statement:

"A plea of fraud or misrepresentations in the procurement of the policy must allege the fact of such fraud, or that insured's false statements or misrepresentations were made with intent to deceive, or that they related to a matter material to the risk, and that they were relied on by insurer, as an inducement to the contract, *unless the conclusion that the false statements were voluntarily and fraudulently made follows from their very nature and evident purpose.*" (Emphasis added).

In *Life & Casualty Ins. Co.* v. *Smith,* 245 Ark. 934, 436 S.W. 2d 97, we quoted with approval from Couch on Insurance 2d, § 35:24, as follows:

" 'If it is shown that the misrepresented matter was material to or increased the risk it is immaterial and irrelevant that the insured had acted in good faith without any bad motive or intent to deceive. This means that if a representation is made which is untrue and material it taints the contract, whether fraudulent or not, and, if untrue and fraudulent, it taints the contract, whether material or not.' "

In *Smith* we also said:

"To the same effect see *Langlois* v. *The Wisconsin National Life Ins. Co.,* 119 N.W. 2d 400 (Wisc. 1963). It was there held that an intent to deceive need not be established. 'It was enough to prove the making of the misrepresentation and its effect upon the risk undertaken.' "

In the Alabama case of *Independent Life Ins. Co.* v. *Seale,* 121 So. 714, a clause in a life insurance policy was to the effect that no obligation was assumed by the insurer unless on the date of the delivery of the policy, insured was alive and in sound health. The insurance company in that case alleged in its affirmative defense:

> "[T]hat the insured, at the date of the delivery of the policy, was afflicted with pulmonary tuberculosis, and that this increased the risk of loss."

In that case the court said:

> "[I]f the unsound health consists of tuberculosis, the court takes judicial knowledge that it does increase the risk of loss. * * *

> It is therefore not necessary to make a specific allegation that tuberculosis, of which insured is alleged to have been afflicted on the date of the issuance of the policy, increased the risk of loss, or that the warranty of sound health was with the intent to deceive.

> The allegation that this increased the risk of loss does not add to the burden of proof, when it is alleged that the unsound health consists of pulmonary tuberculosis, or any other unsound health which the court judicially knows does increase the risk of loss."

We take judicial notice that cancer of the stomach of 29 months duration is material to the risk involved in writing a non-medical examination life insurance policy for a period of one year. Even if we did not take such judicial notice in this case, the misstatement became prima facie material by statute when the appellee prevented medical proof by claiming the medical privilege.

We conclude, therefore, that the judgment of the trial court must be reversed.

Judgment reversed.

HOLT and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. I would affirm this case. Admittedly the appellant, American Pioneer Life Insurance Company did not prove that Mr. Adams procured the credit life policy by means of a false and fraudulent representation. This was the only ground upon which appellant relied in its answer to avoid the policy.

Affirmative matters avoiding a policy must be specifically pleaded. *Atlas Insurance Company* v. *Robison,* 94 Ark. 390, 127 S.W. 456 (1910). Appellant here did not plead the provisions of subsections (b) and (c) of Ark. Stat. Ann. § 66-3208 (Repl. 1966).

Furthermore appellant by its contract had agreed that after 60 days the policy could only be canceled for fraud. The policy provided:

> "The company may cancel the insurance on the life of any borrower five days after written notice has been mailed to the creditor; however, the company cannot cancel the certificate after it has been in force for a period of sixty days unless it is found to have been issued based upon fraudulent information."

It is pointed out in 43 Am Jur. 2d *Insurance* § 1155 that incontestable clauses in insurance policies are favored in the law and that if they are uncertain or ambiguous they are to be construed in favor of the insured.

In *Illinois Bankers' Life Ass'n.* v. *Hamilton,* 188 Ark. 887, 67 S.W. 2d 741 (1934), the defense to the policy was that, as an inducement to reinstate a policy, the insured had represented that the answers she had given as to the state of her health in the original application were true and also true of the date of the reinstatement and that such representations were false. That policy contained a clause which provided: "After this policy shall have been in force two full years during the lifetime of the insured, it shall be incontestable except for nonpayment of premiums." We there held that after two years the incontestable clause waived all defenses in avoidance of the policy except the one reserved for nonpayment of premiums.

In the case before us the insurance was issued to Mr. Adams on February 17, 1971, and he did not die until April 26, 1971, a period in excess of 60 days. Therefore, I would hold the appellant to the terms of its contract that the policy could not be canceled after sixty days except for fraud. I would award an additional $1,000 attorney's fee.

For the reasons herein stated I respectfully dissent.

Holt, J., joins.