NATIONAL OLD LINE INSURANCE COMPANY
*v.* Mary L. PEOPLE

73-231                                                  506 S.W. 2d 128

Opinion delivered March 11, 1974

*Skillman, Durrett & Davis,* and *Austin Cowan,* for appellant.

*Jake Brick,* for appellee.

GEORGE ROSE SMITH, Justice. On July 8, 1971, the appellee and her late husband, William R. People, bought a car from Chalmers Buick Company, executing a 36-month installment contract for the unpaid balance of $5,338.44. At the same time Mr. People applied for and obtained from the appellant a credit life insurance policy upon his own life for the amount of the debt. After People's death on April 5, 1972, the appellee stopped making the payments on the installment contract. When the finance company holding the contract brought this action to recover the unpaid balance, Mrs. People filed a cross-complaint against the appellant upon the credit life policy. The insurer denied liability on the ground that People had obtained the policy by a false and fraudulent statement that he was in good health, when in fact he was not. The jury, in response to an interrogatory, found that People's application for the policy contained no misrepresentations, omissions, concealment of facts, or incorrect statements. In appealing from the ensuing judgment for the appellee the insurance company contends that it was entitled either to a directed verdict or to a judgment notwithstanding the jury's verdict, for want of any genuine issue of fact.

The application and the policy were combined in a single document. There was no medical examination nor any specific questions about People's health. Instead, the application contained this sentence in the fine print above his signature: "I hereby apply for the insurance shown above and represent that I am now in good health, both mentally and physically, and free from any mental or physical impairment of any chronic disease, and am the age shown above." Just above People's signature, in larger capital letters, appeared the statement: "I AM NOW IN GOOD HEALTH."

The policy became effective at once, being signed for the insurer by an employee of Chalmers Buick Company. It

provided, however. that the insurer might reject the insurance within 30 days by mailing notice to its agent, with a return of the premium. There was also a one-year incontestable clause. An agent for the company testified that no investigation of credit life applications is ordinarily made. He stated that although there was no place on the application for any health questions to be answered, the applicant "could clip a note to it stating that he does have a health condition, and we would pass judgment on it."

Although the jury might have found that People acted in good faith in signing the application, the undisputed proof shows that he was not in good health at that time. People's own physician, Dr. Hayes, testified that he had treated People for diabetes and high blood pressure. Both conditions had existed for four years or more before the policy in question was issued.

There is, however, a substantial question of fact whether People's existing ailments were contributing causes to his death. The death certificate listed the causes of death as uremia, chronic renal failure, and arteriolar nephrosclerosis, all of which pertain to the kidneys. Dr. Hayes testified that prior to February, 1972 (which was six months after the issuance of the insurance policy), repeated urinalyses done as early as 1964 were all negative as to any kidney ailment. The witness also stated that until March 3, 1972, there was no indication whatever that People would die of kidney infection or acute renal failure. Upon Dr. Hayes' testimony the jury could have found that People's death was not caused by either diabetes or high blood pressure, from which he was suffering when the policy was issued. (Dr. Hayes also said that People told him that he was drawing 100 per cent disability from the Veterans Administration for a nervous disorder, but there is no suggestion that the disorder was involved in People's death.)

The appellant, in insisting that it was entitled to a directed verdict, takes the position that an absence of any connection between People's death and the ailments from

which he was suffering when the policy was issued is immaterial. The insurer's position is clearly stated in its reply brief: "There is no necessity for showing a causal connection between a matter misrepresented in an application for insurance and the ultimate cause of death of an insured."

We do not so interpret the statute upon which the appellant relies. That section of the Insurance Code reads in part:

"All statements in any application for a life or disability insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

"(a) Fraudulent; or

"(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

"(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract in as large an amount or at the same premium or rate, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise." Ark. Stat. Ann. § 66-3208 (Repl. 1966).

In the fifteen years that have intervened since our Insurance Code was adopted we have considered the foregoing section in many cases, but we have not passed upon the issue now presented—whether a misrepresentation will avoid the policy even though it had no bearing upon the insured's death or disability. Nine of our cases might be considered to be pertinent. In seven of them the same ailment which was assertedly concealed by the applicant was also the cause of death or disability: *Old Am. Life Ins. Co.* v. *McKenzie*, 240 Ark. 984, 403 S.W. 2d 94 (1966) (back trouble stemming from

spinal fusions); *Dopson v. Metropolitan Life Ins. Co.,* 244 Ark. 659, 426 S.W. 2d 410 (1968) (recurrent back trouble); *Life. & Cas. Ins. Co. of Tenn. v. Smith,* 245 Ark. 934, 436 S.W. 2d 97 (1969) ("serious physical ailments which proved to be fatal"); *Union Life Ins. Co. v. Davis,* 247 Ark. 1054, 449 S.W. 2d 192 (1970) (heart trouble); *American Family Life Ass. Co. of Columbus v. Reeves,* 248 Ark. 1303, 455 S.W. 2d 932 (1970) (cancer, which proved fatal); *American Pioneer Life Ins. Co. v. Turman,* 254 Ark. 456, 495 S.W. 2d 866 (1973) (cancer, which proved fatal); *American Pioneer Life Ins. Co. v. Smith,* 255 Ark. 949, 504 S.W. 2d 356 (1974) (heart trouble, which proved fatal). The eighth case, *Old Republic Ins. Co. v. Alexander,* 245 Ark. 1029, 436 S.W. 2d 829 (1969), was a chancery suit by the insurer to cancel the policy. We merely sustained the chancellor's finding that there was no misrepresentation of heart trouble and that the insurer failed to prove that it would not have issued the policy had it known of the applicant's prior surgery. Similarly, in the other case, *Hartford Life Ins. Co. v. Catterson,* 247 Ark. 263, 445 S.W. 2d 109 (1969), the insurer failed to present any evidence that it would not have issued the policy had a full disclosure been made by the applicant.

Thus the present issue of statutory construction is an open one. We are aware, of course, that at common law there was a split of authority on the question whether an insurer could avoid liability where the misrepresentation that induced the issuance of the policy had no causal connection with the loss. Appleman, Insurance Law and Practice, § 215 (1965). The Insurance Code, however, was a comprehensive revision of our law in that field and is to be interpreted according to the usual principles of statutory construction.

It is our conclusion that, under the Code, the insurer must show a causal relation between the applicant's misrepresentation and the eventual loss. Subsection (c) of § 66-3208 to some extent carries that implication, by this language: "The insurer in good faith . . . would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known." Thus it would be a defense to the insurer, in a back injury case, to show that if the applicant had disclosed a history of back trouble it would have excepted that hazard from the policy. In fact, that was precisely the insurer's proof in the *Dopson* case, *supra,*

where the insurer prevailed by offering proof that "it would not have issued the rider without an exclusion relative to Mrs. Dopson's back." Yet if Mrs. Dopson's claim had been for a broken leg, an exclusion of coverage with respect to her back would not have afforded the insurer a defense to the claim.

Fairness and reason support the view that a causal connection should be essential. Otherwise, when the insured is killed by a stroke of lightning or by being run over by a car, the insurance company could successfully deny liability by showing that the insured was suffering from diabetes when he stated that he was in good health.

Such considerations of fairness are especially pertinent to a credit life insurance policy like the one before us. This was a short-term policy, to remain in force for only three years. The company made no medical examination of the applicant, relying upon him either to refuse to sign the application if he was not in good health, in which case the policy would never be issued, or to "clip a note" to the application, explaining his health condition. The appellant had the burden of proving its affirmative defense, but it made no effort to show that the automobile salesman who took People's application made any explanation of the printed form or of the significance of the representation of good health. If People had lived for three years the insurer would have sustained no loss. In the circumstances it is plainly unjust to permit the company to deny liability on the basis of a misrepresentation that had no connection with People's death (or so the jury might have found) and that would have provided no defense to the insurer if the policy had excluded coverage for loss resulting from the undisclosed ailments. We are therefore of the opinion that the appellant was not entitled to a directed verdict or to judgment notwithstanding the verdict.

The appellant also contends that Mrs. People should not have been allowed to testify that the automobile salesman who took the application merely asked People if he had been in the hospital within the preceding three months. We find no error, not only because the salesman was apparently acting for the insurer in taking the application but also because the evidence had no relevant bearing upon the insurer's conten-

tion that it was entitled to judgment as a matter of law. Hence the court's ruling, if erroneous, was harmless.

Affirmed.

FOGLEMAN, J., not participating.

HARRIS, C.J., and HOLT, J., concur.

BYRD, J., dissents.

CARLETON HARRIS, Chief Justice, concurring. I thoroughly agree with the majority that, under the code, the insurer must show a causal relation between the applicant's misrepresentation and the eventual loss. Under the record, it is my own view that William R. People was probably not in good health at the time he applied for an obtained the credit life policy for the amount of the debt; however, it is not at all entirely clear to me that Mr. People *knew* that he was not in good health. I have noticed from time to time, in these cases involving credit life insurance that the affirmative statement called for from the applicant is rather general in nature, (I am now in good health) and can, in many instances, be honestly answered by the applicant by "Yes", though actually he or she may not be in good health. For instance, perhaps one had open heart surgery a few months ago, or an operation on one of his carotid arteries which was partially blocked, endangering the flow of blood to the brain. He is told by his doctor that the operation was successful, and he genuinely feels that he has no further problems and is in good health. In fact, I know of an individual who underwent open heart surgery, and who is using a pacemaker. He constantly plays tennis and engages in other sports and considers himself as getting along fine, but I doubt seriously that an insurance company would consider him an acceptable risk. This man probably could honestly answer the question by stating that he is in good health, though the prospective insurer would disagree.

It would appear to me that the company selling credit life insurance, in its application form, could follow the practice generally followed by insurance companies selling regular life insurance policies, and propound *more specific*

questions which, when answered falsely, if material, would enable the company to avoid liability because of fraud. I refer to such questions as whether one has been in the hospital any time during the last three years, consulted a physician within the last three years, ever been told he had high blood pressure, heart disease, diabetes, cancer, etc. On the basis of such answers, the company can intelligently determine whether to consider the man a good insurance risk.[1] If answers are in the negative and are false, this fact should not be difficult to establish.

I recognize that most persons who apply for credit life insurance are primarily interested in purchasing some article of value, such as an automobile, television, etc., and that the insurance is more or less secondary, suggested by the seller, and if an applicant has to take time to read an application with several questions, he may not purchase the insurance. Of course, it is also "short term" insurance. I can only say if the insurance company selling credit life insurance is willing to take the risk of asking only general questions, it will just have to also take the chance of perhaps paying benefits to the designee of an applicant who was not in good health when he applied for the policy. At any rate, I only desire to point out that liability for fraudulent claims could largely be done away with if specific questions were directed to the applicant.

HOLT, J., joins in this concurrence.

CONLEY BYRD, Justice, dissenting. I disagree with the majority both as to the interpretation of the law and as to the conclusion that the misstatements here were not material.

The majority opinion does not state any precedent or authority for its construction of Ark. Stat. Ann. § 66-3208 (Repl. 1966) that there must be a causal relation between the applicant's misstatement and the eventual loss. A reading of the cases will reveal two types of statutes—*i.e.,* those like or similar to our own and those similar to the Missouri and Texas statutes which provide that no misrepresentation made in obtaining or securing a policy shall avoid the policy unless

---

[1]Actually, some companies selling credit life insurance do set out questions relating to specific ailments in the application form.

the matter actually contributed to the loss. As to the latter see, *e.g.*, *Doran* v. *John Hancock Mutual Life Insurance Company*, 116 S.W. 2d 172 (Mo. App. 1938), and *Pacific Mutual Life Ins. Co.* v. *Johnson*, 74 F. 2d 367 (5th Cir. 1934).

Every state with a statute similar to our statute has construed theirs to mean that a misrepresentation as to a material matter renders a policy voidable at the election of the insurer without a showing that the misrepresentation had a causal connection with the loss claimed under the policy. See *Jessup* v. *Franklin Life Insurance Company*, 117 Ga. App. 389, 160 S.E. 2d 612 (1968); *Lamark* v. *Lincoln Income Insurance Company*, 169 So. 2d 203 (La. App. 1964); *Goodell* v. *Union Automobile Insurance Company*, 111 Neb. 228, 196 N.W. 112 (1923); and *Bushfield* v. *World Mutual Health & Accident Insurance Co. of Pa.*, 80 S.D. 341, 123 N.W. 2d 327 (1963). The statute involved in the Georgia case is an exact replica of ours. The Louisiana code provided:

" . . . The falsity of any such statement shall not bar the right to recover under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

The South Dakota statute provided that the falsity of any statement by the insured "may not bar the right to recover thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer."

The text writers all agree with my position. 43 Am. Jur. 2d Insurance § 737, p. 724, provides:

" . . . In the absence of a statute providing otherwise, however, it is not necessary to the defense of an action on a life insurance policy on the ground that misstatements in the application as to the applicant's medical history were material to the risk, that the matters not disclosed should have had a causal relation to the death of the insured."

45 C.J.S. Insurance § 473(4), pp. 177-178, states the matter in this language:

146

"A material matter is one which probably will affect the decision of the company as to the making of the contract or as to its terms. The question of what is a material representation is not affected by the causes which in fact lead to the loss. . . . "

12 Appleman, Insurance Law and Practice § 7294 (1943), pp. 401-403, makes the following statement:

"The tests of materiality have been stated in various ways. If the representations materially induce the insurer to make the contract, or would reasonably have influenced the insurer in its action upon the application, the representation is deemed material. Some courts have made the test that of whether or not the insurer would have issued the policy had the true facts been known, or whether, acting in accordance with the usual practice of insurance companies, it would have declined to take the risk. Elsewhere it has been stated that the proper test is whether knowledge of the truth might *reasonably* have caused the insurer to decline the risk, and under this rule the question of whether the insurer would actually have issued the policy under those circumstances has been held immaterial. *And, under this general doctrine, the fact that the risk of loss was not actually increased thereby, or that the loss arose by reason of some fact other than that which was misstated, has been held not to alter the result."* [Emphasis mine].

7 Couch On Insurance 2d § 35:47 (1961), p. 56, makes the following statement:

"The concept of materiality to the risk is distinct from that of contributing to the loss. In order to establish that a representation is material it is therefore not necessary to show that it contributed to a loss. Similarly, a misrepresentation in an accident insurance application which would influence insurer's judgment in accepting the risk is material within the intent of the statute, even though the matter misrepresented does not affect the injury for which insured seeks recovery."

Under our law as it existed before the 1959 Insurance Code, life insurance could not be economically written without the costly and cumbersome procedure of going through a medical examination to weed out persons who waited until they were uninsurable before making application. However, the code through what is now Ark. Stat. Ann. § 66-3208 permitted life insurance to be written without a medical examination. To prevent the seeming injustice that would arise when an individual has paid premiums for a considerable time and during which time the insurer has had the benefit of the premiums, the code also contains a relatively short incontestability clause—see Ark. Stat. Ann. § 66-3304 (Repl. 1966).

Aside from the history, however, logic and reason would dictate that we should not be in the position of quibbling over whether a misstatement contributed to the loss involved in an insurance contract. A person who honestly answers the questions in an application has nothing to fear. *Old Republic Ins. Co.* v. *Alexander*, 245 Ark. 1029, 436 S.W. 2d 829 (1969). Most litigation arises around issues that are generally debatable as to whether the misstatement involved a matter that contributed to the loss. For instance in this case I contend that the misstatements involved matters that contributed to the insured's death.

The misstatements by the insured here before us kept the insurer from finding out that the insured was suffering from diabetes and hypertension for which he was under constant medication and that insured was considered 100 per cent disabled by the Veterans Administration. Dr. Robert Hayes testified, [as abstracted] as follows:

" . . . The death certificate indicates the cause of death is uremia and the contributing factors to the cause of death were chronic renal failure, and arteriolar nephrosclerosis; these conditions all refer to his terminal illness. Chronic renal failure and arteriolar nephrosclerosis are the end result of diabetes and hypertension. . . . I would assume that Mr. People apparently went into an acute renal failure episode which overshadowed every other thing he had; the last time I

saw Mr. People I certainly didn't suspect that he was anything like going into an acute renal failure syndrome . . . ."

Dr. Hayes was the appellee's witness and from the foregoing I can only conclude that the misstatements by the insured here involved matters that contributed to his death. At least Dr. Hayes says that those matters contributed to his death.

## CONCLUSION

There is nothing "just" about the majority's interpretation of the statute because it will increase the premium rate of life insurance to the honest insured to the bounty of those who misstate the facts in making their applications—for after all life insurance is an actuarial business based upon the business written not necessarily the life of every individual.

The authorities all show that there were two different statutes in general use among the several states at the time of the adoption of The Insurance Code in 1959—i.e. there was (1) the Missouri and Texas type which avoided a policy for a misstatement only when the misstated matter "actually contributed to the loss" and (2) the Louisiana and Nebraska type statute which our legislature adopted. Under those conditions we should have no problem in understanding the policy adopted by the General Assembly.

However, if the majority must insist in what I consider to be new legislation, then the majority should at least accept the insured's witnesses at face value when he states that the matters omitted through the insurer's misstatements contributed to his death.

For the reasons stated I respectfully dissent.