**Homer GATLIN, Administrator of the Estate of Freida Gatlin, Deceased, Plaintiff-Appellant,**

v.

**WORLD SERVICE LIFE INSURANCE COMPANY, Defendant-Appellee.**

Supreme Court of Tennessee.

June 1, 1981.

Elliott Ozment, Cross, Stiles & Ozment, Nashville, for plaintiff-appellant.

Lewis B. Hollabaugh and Thomas E. Shoenheit, Manier, White, Herod, Hollabaugh & Smith, Nashville, for defendant-appellee.

### OPINION

FONES, Justice.

Several related issues have been raised in this case involving an assertion of "good health" by decedent when she applied for group credit life insurance. We view the controlling issue to be whether such an assertion constituted a "misrepresentation" as a matter of law; thereby mandating a directed verdict in favor of defendant because the falsity of this assertion "increased the risk of loss" to the insurance company as a matter of law. The trial court and the Court of Appeals held that there was a misrepresentation that increased the risk of loss and the Court of Appeals affirmed the

trial court's decision to direct a verdict in favor of defendant. Special Judge Camp dissented. We agree with the dissent and hold that the trial court and Court of Appeals were in error and the issue should have been submitted to the jury for a determination of whether decedent reasonably and in good faith asserted her opinion of good health.

I.

The facts in this case are not controverted. On May 21, 1976, Freida Gatlin, decedent, went to Truex Chevrolet in Jackson to purchase a car. The testimony of her aunt who accompanied her, and of the salesman revealed that when she filled out the paper work the salesman told her he would like to sell her group term credit life insurance. She did not ask for this insurance but accepted his offer. He gave her the application form and she signed it.

Next to the line where she was instructed to sign was the following sentence: "I hereby certify that I am in good health as of the effective date above." The application also stated that, "In consideration of the premium shown above and the representation of good health, the company certifies that the above named Debtor is afforded the coverage or coverages for which a premium or premiums are specified ... subject to the terms and conditions of the above numbered Group Life Policy." The application form contained specified conditions and limitations of coverage, but none referred to the applicant's health.

The application was accepted by defendant, World Service Life Insurance Company, and decedent was issued a policy. One of the conditions for acceptance of the policy was as follows:

"6. INSURABILITY OF INSURED DEBTORS. No certificate of Insurance shall be delivered to any Debtor or the Creditor unless the Creditor or Creditor's agent ascertains and believes that the Debtor is in good health on the effective Date Specified in said Certificate of Insurance."

The record reveals that the salesman who sold decedent this policy accepted her assertion of "good health" without reservation and asked her no questions whatsoever concerning her health. The application form contained no space or specific questions whereby the applicant could elaborate on, qualify, or explain his or her assertion of "good health."

On August 4, 1976, less than three months from these transactions, decedent died of a cerebral hemorrhage. The record reveals that decedent suffered from hypertension, or high blood pressure, but was taking medication to control this condition under the medical care of Dr. Kendall. Dr. Kendall admitted the condition of decedent, but also made the following comments:

"Q. Did you examine Mrs. Gatlin on April 1st, 1976?

A. Yes.

Q. Was this the last time that you examined or treated Mrs. Gatlin prior to May 21, 1976?

A. Yes.

Q. How would you describe her condition at that time, on April 1, 1976?

A. The only thing I could note would be from my records because of the length of time since that date, but on that occasion her blood pressure was probably the lowest it had been or as low as it had been since I had been seeing her since 1975. Her blood pressure on this occasion was down to 150 over 100, and she was going quite well at that time. She had no problems that she admitted to. She said she felt fine, and we felt like her blood pressure was probably under as good a control as it had been since we had started seeing her.

Q. Did you tell her that she was doing very well on that occasion?

A. I'm not sure, but I would imagine, based on what is written here, that I probably did.

Q. May I see your chart?

A. Yes, sure.

Q. Could you just read the first three sentences of the entry on April 1, 1976.

A. 'Mrs. Gatlin comes in today. Her blood pressure is 150 over 100. I think she is doing quite well.'

Dr. Kendall further testified that although hypertension was "more serious than a temporary thing," a person could be considered in "fairly good health" if his or her blood pressure was kept under control. Addressing the question of control with Mrs. Gatlin, he testified that he first saw her on November 21, 1975, at which time her blood pressure was 190 over 130. By December 29, 1975, her blood pressure had been reduced to 150 over 100 and was the same on April 1, 1976. Dr. Kendall answered the question as to whether this was "normal" or not as follows:

"A. In her age category a blood pressure of 140 over 90 is considered to be the standard as a normal cutoff. Most authorities feel that you want to get the blood pressure down to 90, but most people feel if you can get it below 100 you are doing very well in most cases."

Mrs. Gatlin had no other complaints other than those related to hypertension.

## II.

The issues presented involve the proper interpretation and application of T.C.A. § 56–7–103, which states:

"Misrepresentations or warranty will not avoid policy—Exceptions.—No written or oral misrepresentations or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increase the risk of loss."

In this Court's recent opinion of *Womack v. Blue Cross and Blue Shield of Tennessee*, 593 S.W.2d 294 (Tenn.1980), we noted that application of this statute involved two steps:

"[T]o avoid coverage the insuror must first prove that the answers in the application were false; then it must prove

either that the false answers were given with intent to deceive the insuror or that the false answers materially increased the risk of loss." *Id.* at 295.

The Court further stated that normally, "unless the minds of reasonable men could reach only one conclusion," the question as to whether the answers in the application were true or not was a jury decision; once it was determined that the answers were false, however, it was a question of law for the court to decide whether the false answers materially increased the risk. *Id.*

■ It is clear, therefore, and must be kept in mind, that the concept of "misrepresentation" is totally distinct and separate from the concepts of "intent to deceive" or "increase in the risk of loss." The latter elements are not analyzed at all until and unless a matter has been "misrepresented." The trial court and the Court of Appeals were of the opinion that here there had been a misrepresentation as a matter of law because decedent was not *in fact* in "good health" when she had represented that she was. This conclusion, we hold, was error.

In order to determine whether a matter has been *mis*represented it must first be determined what the insurer asked, required, or expected the applicant to represent.

In the present case even if decedent was representing that she was *in fact* in "good health" on the day of these negotiations, the facts are sufficiently close so that reasonable minds might differ on this issue, and it should have been submitted to the jury. We do not decide this case on that point alone, however, for we hold that under the facts of this case decedent did not intend, nor was she asked, to *warrant* that she was *in fact* in "good health."

In 26 A.L.R.3d 1061 (1969) the compiler makes an exhaustive study of decisions dealing with representations of "sound" or "good" health. The author states as follows:

"It is generally agreed that an insurer may avoid a policy of life or health insurance issued upon an application in which

the applicant has knowingly made false statements as to a material matter affecting the health of the insured. However, where an applicant for a life or health policy has stated in the application that the condition of his health, or the health of another if the insured is a third person, was then good, under an honest mistake or in the reasonable belief that the statement was true, the more difficult question is presented whether the statement is to be regarded as a mere representation of the applicant's good-faith belief in the soundness of his health or as an absolute assertion, or warranty, of the fact of his good health.

Under strict principles of contract law, a misstatement of a fact materially affecting the risk to be assumed under the contract of insurance, whether made in good faith or otherwise, may be a ground for cancellation of the contract. Generally, however, the courts have taken the more liberal position that a statement as to the condition of one's health, or the health of another, being as to a matter about which one may be honestly mistaken, is not, in the absence of some express directive, the absolute assertion of a fact." *Id.* at 1065–1066.

In *Knights of Honor v. Dickson*, 102 Tenn. 255, 52 S.W. 862 (1899), it was alleged by the insurer that the insured had made certain misstatements in his application as to the exact disease of which his brother died; that the statements were untrue and material to the risk involved, and thus he could not recover under his insurance policy. The Court disagreed:

"We are of opinion the criticisms made upon the charge are not well made. It is true that any statement made of a material fact which forms the basis of the contract must be considered as a warranty, and if false will vitiate the contract whether made in good faith though ignorantly, or willfully and with knowledge of the falsity. But there is a difference between statements of fact as such and statements of opinion on matters where only opinion can be expressed. Falsehood may be predicated of a misstatement of

fact but not of a mistaken opinion as to whether a man has a disease when it is latent and it can only be a matter of opinion. As to what a person may have died of may be largely, if not altogether, a matter of opinion, about which attending physicians often disagree, and as to such matters their statement made can only be treated as representations and not as warranties, and if made in good faith and on the best information had or obtainable, they will not vitiate a policy if incorrect and not willfully untrue." *Id.* at 260–61, 52 S.W. 862.

We find the above quoted language most applicable to situations where a layman is asked to state whether he is in "good health." Such a broad and general question can only be categorized as an opinion and not a warranty of fact.

In the case of *Metropolitan Life Ins. Co. v. Chappell*, 151 Tenn. 299, 269 S.W. 21 (1924), the Court was faced with a situation where one of the *conditions* of the insurance contract were that the insured be in "sound health" *in fact* before any obligations were assumed. The evidence revealed that the insured was not *in fact* in "good health" and the Court ruled that this evidence relieved the insurer from its obligations under the contract. The Court noted:

"[I]t is clear *from the language of the policy* that defendant's promise of insurance was not absolute, but conditional, and that *the existence of* life and *sound health* in the insured on the date of the policy *is the condition* on which the promise is made. *It is the fact of sound health* of the insured which determines the liability of the defendant *in this character of policies,* not apparent health, or his or any one's opinion or belief that he was in sound health." (Emphasis added.) *Id.* at 310–11, 269 S.W. at 25.

This language clearly indicates that the result may well have been different had the insured's mere *opinion* of "good health" been the only basis of the contract. In the present case the *fact* of "good health" was not a condition to the acceptance of coverage.

In other jurisdictions the distinction between warranties and representations of "good health" has been emphasized. We note the state of Massachusetts has a statutory provision for all practical purposes identical to T.C.A. § 56–7–103. *See* M.G. L.A. c. 175, § 186; *Mutual Life Ins. Co. v. Dibrell*, 137 Tenn. 528, 194 S.W. 581 (1916).

In a trilogy of cases the Massachusetts Supreme Court has held that vague and broad questions regarding whether the insured is in "good health" or has ever had an "illness" or "disease," would be construed as mere representations of opinions and *not* warranties; that such questions would be construed against the insurance company and would not avoid the policy if not answered fraudulently; and that the issue of good faith and reasonableness of the insured's responses were a question for the jury. *Metropolitan Life Ins. Co. v. Burno*, 309 Mass. 7, 33 N.E.2d 519 (1941); *Rappe v. Metropolitan Life Ins. Co.*, 320 Mass. 376, 69 N.E.2d 584 (1946); *Davidson v. Massachusetts Casualty Ins. Co.*, 325 Mass. 115, 89 N.E.2d 201 (1949).

The analysis used by the Massachusetts Court has also been followed in several other jurisdictions. *See* 26 A.L.R.3d 1061, § 10 (1969).

In the case of *Ford Life Insurance Company v. Jones*, 262 Ark. 881, 563 S.W.2d 399 (1978), the facts were quite similar to those of the present case. The Court, in the admittedly close two-to-two decision affirming the decision of the trial court, concluded that the statement of "good health" should not be used as a defense by the insurance company when there was no evidence of misrepresentation or fraud. We find Chief Justice Harris' concurring opinion, however, to be most persuasive. Quoting from his own concurring opinion in *National Old Line Insurance Co. v. People*, 256 Ark. 137, 506 S.W.2d 128 (1974), he states:

" 'I have noticed from time to time, in these cases involving credit life insurance that the affirmative statement called for from the applicant is rather general in nature, (I am now in good health) and can, in many instances, be honestly answered by the applicant by 'Yes,' though actually he or she may not be in good health. For instance, perhaps one had open heart surgery a few months ago, or an operation on one of his carotid arteries which was partially blocked, endangering the flow of blood to the brain. He is told by his doctor that the operation was successful, and he genuinely feels that he has no further problems and is in good health. In fact, I know of an individual who underwent open heart surgery, and who is using a pacemaker. He constantly plays tennis and engages in other sports and considers himself as getting along fine, but I doubt seriously that an insurance company would consider him an acceptable risk. This man probably could honestly answer the question by stating that he is in good health, though the prospective insurer would disagree.

It would appear to me that the company selling credit life insurance, in its application form, could follow the practice generally followed by insurance companies selling regular life insurance policies, and propound more specific questions . . . I refer to such questions as whether one has been in the hospital any time during the last three years, consulted a physician within the last three years, ever been told he had high blood pressure, heart disease, diabetes, cancer, etc. On the basis of such answers, the company can intelligently determine whether to consider the man a good insurance risk. If answers are in the negative and are false, this fact should not be difficult to establish. . . .

I can only say if the insurance company selling credit life insurance is willing to take the risk of asking only general questions, it will just have to also take the chance of perhaps paying benefits to the designee of an applicant who was not in good health when he applied for the policy.' " *Id.* at 887–888, 563 S.W.2d at 402–03.

In this Court's recent decision of *Broyles v. Ford Life Insurance Co.*, 594 S.W.2d 691 (Tenn.1980), the Court was faced with a situation involving a term life insurance

policy in which the insured had stated that he was in "good health." In that case the insured had been under treatment for leukemia; the treatment caused him to experience blurred vision, headaches, stomach disorders, and rendered him unable to take some medication. He was undergoing frequent tests and although the treating physician would not say that he specifically told Broyles that he had "leukemia," he testified that Broyles positively knew he had a medical problem. There was a concurrent finding by the trial court and the intermediate appellate court that Broyles did not know he had leukemia, but this Court found, as a matter of law, that he had misrepresented the state of his health, based upon the overwhelming evidence that he knew he had a serious medical problem. Another important distinction between the *Broyles* case and the present one is that in *Broyles* the application form contained a place for exceptions or limitations on the general statements of health where it was indicated that applicants should qualify the assertion of "good health," if appropriate. Thus, it was much more evident in that case that the insurance carrier was relying on the *fact* of "good health" rather than the mere representation or opinion of such status.

In the present case decedent went to purchase a car, not insurance. When the salesman told her that he wanted her to buy credit term life insurance, she accepted. The document she signed contained only the simple request that she certify that she was in "good health" without any explanation as to what constituted "good health" or any space or follow-up questions indicating that she was to qualify this assertion. The application clearly stated that she would be insured "in consideration of the premium . . . and the *representation* of good health." (Emphasis added.) The salesman accepted her assertion of "good health" and asked her no questions. The *fact* of her "good health," an elusive term at best, was never indicated to be a condition upon which the policy was based. Based on the testimony of her doctor, she may have reasonably and in good faith thought that she was in "good health."

Under these facts we hold that the good faith and reasonableness of decedent's assertion of "good health" were the determining factors as to whether there was any "misrepresentation" involved in this case. These are matters upon which reasonable minds may differ under the facts of this case, and thus should have been submitted to the jury to consider along with all the surrounding circumstances.

Should the jury, in the new trial, conclude that decedent asserted her opinion as to her "good health" reasonably and in good faith, then there would be no "misrepresentation" and the jury should find for the plaintiff. If the jury finds that decedent did not give her opinion reasonably or in good faith, then they should conclude that there was a "misrepresentation." Only then will it be left to the trial court to determine, as a matter of law, that this misrepresentation increased the risk to the insurer. If upon retrial the proof presents the issue of whether the decedent misrepresented her opinion of her health with "actual intent to deceive" this issue should also be presented to the jury. Of course, the issue or issues to be submitted to the jury on retrial must be governed by the proof offered. *See Womack v. Blue Cross and Blue Shield of Tennessee, supra.*

Other issues raised on this appeal we hold are without merit or have been sufficiently answered herein. The decision of the Court of Appeals is reversed and the case remanded for a new trial. Costs of this appeal are assessed against defendant-appellee.

HARBISON, C. J., COOPER and BROCK, JJ., and CORNELIUS, Senior Judge, concur.