IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 21, 2004 Session

## PAMELA K. GINN v. AMERICAN HERITAGE LIFE INSURANCE COMPANY, ET AL.

Appeal from the Circuit Court for Monroe County
No. V01011P     Lawrence H. Puckett, Judge

---

### No. E2004-00198-COA-R3-CV  - FILED DECEMBER 29, 2004

---

Pamela K. Ginn ("Plaintiff") purchased a $50,000 life insurance policy on her husband through American Heritage Life Insurance Company ("American Heritage").  When applying for the insurance, Plaintiff told the insurance salesman, Daryle Gross ("Gross"), that her husband was in "basic good health."  Plaintiff's husband died a few weeks after the life insurance went into effect. American Heritage denied Plaintiff's demand for the life insurance proceeds, claiming Plaintiff had materially misrepresented her husband's health.  Plaintiff sued American Heritage and Gross ("Defendants").  The jury found Defendants breached their contract with Plaintiff.  The jury also found that the refusal to pay was done in bad faith, assessing a 25% bad faith penalty.  The jury also concluded Defendants had violated the Tennessee Consumer Protection Act ("TCPA") and assessed compensatory damages under the TCPA at $110,000, which was remitted by the Trial Court to $73,855.15.  Pursuant to the TCPA, the Trial Court then trebled the damages and awarded attorney fees.  When all was said and done, the amount of the judgment awarded to Plaintiff totaled $284,980.60.  Both Plaintiff and Defendants appeal various aspect of the Trial Court's Judgment. The Judgment of the Trial Court is reversed in part and affirmed in part, and judgment is entered in favor of Plaintiff in the total amount of $73,415.15.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit
Court Affirmed in Part and Reversed in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

William S. Lockett, Jr., Knoxville, Tennessee, for the Appellants American Heritage Life Insurance Company and Daryle W. Gross.

John W. Cleveland, Sweetwater, Tennessee, for the Appellee Pamela K. Ginn.

**OPINION**

**Background**

        This lawsuit involves a claim for life insurance proceeds with the threshold issue being whether Plaintiff misrepresented her husband's health when applying for the insurance. Plaintiff knew her husband, Mr. Tony Ginn, had been diagnosed with diverticulitis in 1991 before they were married in 1992. Her husband was prescribed antibiotics and the diverticulitis "cleared up and he was fine." The diverticulitis flared up again in 1998. This time, Mr. Ginn, who was 5'6" and weighed 190 pounds, lost approximately 60 pounds. Mr. Ginn was treated by Dr. Kozawa who prescribed antibiotics and instructed Mr. Ginn to eat a lot of fiber. Unfortunately, the fiber seemed to make matters worse and, according to Plaintiff, her husband's health went "downhill." Mr. Ginn nevertheless continued to work at a paint and body shop and engage in recreational activities with his three children. Mr. Ginn eventually went to the emergency room when his symptoms did not improve. By that time, he was unable to keep food down and when he did, he had diarrhea. After being treated by various physicians, Mr. Ginn was instructed by Dr. McDonald to quit taking fiber. Mr. Ginn then started to improve and regained approximately 20 pounds. Mr. Ginn stopped taking antibiotics in January of 1999 and seemed to be feeling fine, although he continued to take five milligrams of diazepam every day for stomach spasms.

        Plaintiff has a seventh grade education and was employed as a sewing machine operator at DCB Rothco ("DCB"). While employed at DCB, Plaintiff occasionally observed defendant Gross, an insurance salesman, come into the plant. February 24, 1999, was the day Plaintiff first spoke with Gross. According to Plaintiff, Gross "just walked up to my [sewing] machine and approached me" about purchasing insurance. Plaintiff asked Gross how much life insurance would cost, and he responded that it would be deducted from her payroll check and the combined cost for Plaintiff and her husband would be $9.47 per week. Gross quoted her the price after he asked Plaintiff if she and her husband were smokers, to which Plaintiff responded that they were. Gross then asked Plaintiff if she or her husband had AIDS, and Plaintiff said that they did not. Plaintiff testified that Gross then stated: "So, in other words, you're in basic good health." Plaintiff responded in the affirmative. Plaintiff claims Gross did not ask her any other questions, took no notes, and she never saw the application for life insurance. Gross did, however, set up his laptop computer on her sewing machine and was entering information during their conversation. Plaintiff claims Gross asked no other questions about her husband's health. Plaintiff then signed what "looked like [an] Etch-a-Sketch type board, a little square box." Plaintiff testified that Gross asked her to sign her husband's application as well. The next day Gross brought her a folder with medical injury claim forms, but nothing related to life insurance. Plaintiff noticed premiums being withheld from her paycheck on March 9th, 1999. Plaintiff received the life insurance policies issued through American Heritage on March 29th, 1999. Mr. Ginn died the next day of a myocardial infarction.

Plaintiff received a letter dated August 11, 1999, from Claudia Osborne ("Osborne") in the Claims Department for American Heritage. Osborne expressed her condolences to Plaintiff for the loss of her husband. Osborne then stated that had American Heritage been apprised of Mr. Ginn's actual medical condition, it would have "postponed" issuing a policy until "a definite diagnosis had been made and it [was] determined we would have accepted that risk. Accordingly, we regret we will be unable to honor your request for benefit. A refund of all premiums paid to date will be sent to you under separate cover."

Plaintiff filed this lawsuit in January of 2001 asserting claims based on breach of contract, bad faith refusal to pay the insurance proceeds, as well as violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101, *et seq*. Defendants denied any liability to Plaintiff, claiming Plaintiff had materially misrepresented the state of her husband's health when she applied for the insurance.

A trial was held in September of 2003 and much of Plaintiff's testimony on direct examination is set forth above. In addition to that testimony, Plaintiff also was asked about the medical questions on the insurance application. These questions ask whether the applicant has certain specific ailments or diseases. Plaintiff testified she never was asked any of these questions. She also testified that other than questions about AIDS and smoking, the only other medical question asked by Gross was whether she and her husband were in basic good health, to which Plaintiff responded in the affirmative. When asked about her husband's health at the time the application for life insurance was completed, Plaintiff explained:

> Q. Compared with the entire rest of the time that you had known Tony Ginn, what was the state of his health on February the 24th.
>
> A. In good health.
>
> Q. Was there anything remarkable about his health, physical condition, or treatment between then and the day that he died?
>
> A. No.
>
> Q. Did he go back for any additional treatment or examination?
>
> A. He had a [colonoscopy … on] the 22nd of March. … [After the colonoscopy] Dr. Gholson did come out and hand me some pictures of – I guess of his colon and said that everything looked fine.

Plaintiff went on to add that after the colonoscopy on March 22nd, her husband returned to work the next day. The following Monday he became sick, "hurting in his chest, throwing up." Mr. Ginn went to work and called Plaintiff later that day telling her he still was feeling bad. Mr. Ginn died in his sleep that night. The Certificate of Death listed the cause of death as a myocardial infarction.

Plaintiff met with Gross at DCB on the Monday following her husband's death. Gross provided Plaintiff with a form for a doctor to fill out and one for the beneficiary (i.e., Plaintiff) to fill out. Plaintiff stated Gross asked why her husband was taking diazepam and why she indicated he had been in good health. Plaintiff responded that "he was, as far as I was concerned." Gross then stated that he thought Mr. Ginn was in good health based on what Plaintiff had said, and Plaintiff told him "he was, other than diverticulitis, [and] it's not a life threatening disease. And [Gross] said, well, that wasn't no big deal, he had it also."[1]

While receiving medical treatment in the past, Mr. Ginn had filled out a "Patient Information Sheet." This document is undated but appears to be from a recent medical examination. Mr. Ginn was asked to list any chronic illnesses or conditions and he wrote: "Diverticulitis; High Blood Pressure; Adrenal Nodule 2.3 x 1.7 cm, Hidal Hernia (sic); and Hemerode Disease (sic)." Defendants, however, never asked Mr. Ginn for his medical information. Plaintiff admitted on cross-examination that her husband had discussed with his doctor the possibility of having a portion of his colon removed. The doctor informed Mr. Ginn that another colonoscopy would have to be performed before that procedure would be considered, and this in why the colonoscopy was performed in March of 1999 shortly before Mr. Ginn's death. Plaintiff also testified on cross-examination that her husband would only go to the doctor when the pain was so bad he "couldn't take it no longer." Plaintiff then acknowledged that her husband was going to a doctor on a regular basis the last year of his life.

Gross testified that he would go to businesses and sell various forms of insurance. Shortly after arriving at DCB on February 24, 1999, a couple of employees informed him that Plaintiff was interested in purchasing life insurance. Gross then "went to the plant supervisor to seek authorization" to go onto the plant floor. Gross testified that the plant supervisor showed him who Plaintiff was because he had never met her before. Gross testified it was typical business practice when selling insurance on an employee's spouse for the employee to sign for his or her spouse when the insurance was being sold in the workplace.[2] According to Gross, American Heritage authorized him to sell insurance on the life of a spouse when the other spouse signed the application. Disputing Plaintiff's testimony, Gross stated that he asked Plaintiff the medical questions and all of the questions that appeared on the application, except for a few questions where no response was needed because they were not pertinent to life insurance policies. Gross earned a commission of "[a]round seven dollars" on the sale of the policy insuring Plaintiff's husband. Gross

---

[1] One of Plaintiff's coworkers testified she overheard this conversation at the time the initial application for insurance was filled out, while Plaintiff's testimony clearly was that it took place after her husband had died.

[2] Defendants never have claimed the insurance was invalid because Plaintiff signed the application on her husband's behalf.

-4-

claimed he specifically asked Plaintiff about whether her husband had any chronic conditions and she responded that he did not. After Mr. Ginn died, Gross asked Plaintiff why she had not answered that question correctly, and Plaintiff responded that she thought her husband's condition (i.e., diverticulitis) was not that important. Gross went on to state that had Plaintiff answered the question correctly, he still could have insured Mr. Ginn, but he would have had to go through a different insurance company that was "a lot more liberal." Gross stated:

> [I also sell insurance for] Colonial Life and Accident … [and] if someone had some pertinent health problems, I would place it with them because they are a lot more liberal.
>
> They don't ask a lot of these questions that are on that application and so those policies automatically get approved and you have coverage.…

Gross went on to add that he carried two laptop computers with him. One of the laptops contained only the application for Colonial. "Those that had health problems, I would have opened the Colonial computer and I would enroll them in that …." Gross stated that had Plaintiff correctly informed him of her husband' health, he would have closed the laptop with the American Heritage application, and simply opened the one with the Colonial application. According to Gross, the premiums charged by the two companies were substantially the same. The American Heritage insurance application does not contain a question specifically asking if an applicant has diverticulitis, but one of the questions does inquire about whether the applicant is in good health or if the applicant has a chronic disease.

Pearl Harrison ("Harrison") is the vice-president of claims for American Heritage. Harrison testified that whenever a death occurs within two years of the inception of a life insurance policy, the company requests medical records to determine whether or not the information received in the records is consistent with the information provided on the application. With regard to Mr. Ginn's application, the underwriting department when reviewing Mr. Ginn's medical records concluded, due to the significant number of medical problems he was having, that at the very least, American Heritage would have deferred issuing a policy until there was a final diagnosis. Harrison testified that when the company obtained Mr. Ginn's medical records, they discovered:

> This gentleman had hypertension, rectal bleeding, which was I believe bright red blood, as it was described. Severe abdominal pain. He was on multiple medications. Relatively high doses for a very long period of time.
>
> He complained constantly, at one point he had back pain, he had a family history of his father died in his 50s of colorectal cancer. He had had colonoscopies. There were notes in the records indicating that … the physicians were concerned about his negative findings, but

his conditions [were] elusive. They couldn't determine what his true diagnosis was.

And it went on to describe a 60 pound weight loss in a brief period of time. And the records appear to me to be ones where the physicians were unable to diagnose this condition, but found it significant enough to treat him frequently and to question what significant problems he had going on.

Mr. Neal Crawford ("Crawford") also testified for American Heritage. Crawford is the vice-president in charge of underwriting and testified that when Mr. Ginn's policy was issued, American Heritage authorized its agents to have a spouse sign for the other spouse when they were taking applications in the workplace. Crawford likewise testified that the claims department investigates claims when a death occurs within two years of the policy being issued.

After the testimony was completed, the jury was furnished with a verdict form containing various questions. With regard to the breach of contract claim, the jury found Plaintiff had not falsely represented her husband's health, and went further and found that Plaintiff had not falsely represented her husband's health with the intent to deceive the Defendants into issuing the policy. Accordingly, the jury concluded Defendants breached their contract with Plaintiff and awarded her the face value of the life insurance policy, i.e., $50,000. The jury also awarded pre-judgment interest at the rate of 10%. The jury further found Defendants acted in bad faith when refusing to pay Plaintiff, that the bad faith caused Plaintiff to incur additional expense, loss or injury, and that Plaintiff was entitled to recover from Defendants a bad faith penalty of 25%. As to Plaintiff's TCPA claims, the jury found Defendants employed deceptive or unfair practices and awarded Plaintiff compensatory damages under the TCPA in the amount of $110,000.

Plaintiff filed a post-trial motion seeking an award of attorney fees pursuant to the TCPA. Plaintiff also sought discretionary costs in the amount of $1,853.51 pursuant to the TCPA and Tenn. R. Civ. P. 54.04. Defendants filed a motion for a directed verdict or, in the alternative, a motion for a new trial or to alter or amend the judgment. The Trial Court resolved the post-trial issues by requiring Plaintiff to elect between her remedies, i.e., breach of contract and the bad faith penalty, or the remedies available under the TCPA. Plaintiff elected the TCPA. The Trial Court suggested a remittitur in the amount of compensatory damages awarded by the jury under the TCPA from $110,000 to $73,855.15, which Plaintiff accepted. The Trial Court did, however, treble the remitted compensatory damage award bringing the total award of compensatory damages to $221,565.45. The Trial Court then awarded Plaintiff $40,000 in attorney fees, $1,853.51 in discretionary costs, and $21,561.64 in pre-judgment interest. The total award to Plaintiff was $284,980.60.

Defendants appeal raising numerous issues. Although not stated exactly as such, Defendants claim: 1) the Trial Court erred by denying Defendants' motion for directed verdict; 2) the Trial Court erred when it refused to set aside the jury's verdict when Plaintiff made a material

misrepresentation when applying for the life insurance; 3) the jury's finding of a violation of the TCPA is not supported by the evidence; 4) the jury's finding that Defendants acted in bad faith when denying the claim is not supported by the evidence; 5) the Trial Court's jury instruction on misrepresentation was legally erroneous; and 6) the Trial Court erred in admitting certain evidence. Plaintiff raises three additional issues. First, Plaintiff claims the Trial Court erred when it suggested a remittitur in the amount of compensatory damages awarded by the jury pursuant to the TCPA. Second, Plaintiff claims the Trial Court erred when it required her to choose between the breach of contract remedies, including the bad faith penalty, or the remedies available under the TCPA. Finally, Plaintiff claims that pursuant to the TCPA, she was entitled to an award of all of her attorney fees and the Trial Court erred by only awarding a portion of those fees.

## Discussion

We first address Defendants' claims that the Trial Court erred in not directing a verdict in their favor on the breach of contract claim. As this Court recently explained in *Stooksbury v. American Nat. Prop. and Cas. Co.*, 126 S.W.3d 505 (Tenn. Ct. App. 2003):

> In deciding whether a trial court was correct in granting or denying a motion for directed verdict, an appellate court cannot weigh the evidence.
>
> > Rather, it must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary. The trial judge's action [granting a motion for directed verdict] may be sustained only if there is no material evidence in the record that would support a verdict for the plaintiff, under any of the theories that he has advanced.
>
> *Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521, 525 (Tenn. 1980) (quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978)).
>
> > To resolve this issue, we must determine if the Trial Court was correct when it overruled Defendant's motion for directed verdict, thereby implicitly concluding there was material evidence that would support a verdict for Plaintiff.

*Stooksbury*, 126 S.W.3d at 516.

With regard to the breach of contract claim, the jury was asked two closely related questions on this issue and found that Plaintiff had not falsely represented her husband's medical condition when applying for insurance. Whether Plaintiff made a misrepresentation as to her

husband's health is the threshold question both at trial and in this appeal. What this Court first must determine is whether there was substantial and material evidence to support this aspect of the jury's verdict. The term "substantial and material evidence" has been defined as "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Papachristou v. Univ. of Tennessee*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000) (quoting *Clay Co. Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993)). This Court also has described it as requiring "something less than a preponderance of the evidence . . . but more than a scintilla or glimmer." *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999) (quoting *Wayne Co. v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)).

We believe there was a clear factual issue presented to the jury on whether Plaintiff materially misrepresented that her husband was in "basic good health." As noted, this Court is not to weigh the evidence, and we cannot say that Mr. Ginn's health at the relevant time was so bad that we must hold, as a matter of law, that there simply was no way Plaintiff could honestly and subjectively have believed her husband to be in "basic good health." Plaintiff testified she believed her husband to be in basic good health at the time she applied for the insurance and why she believed this to be so. For example, while Plaintiff testified that her husband had lost approximately sixty pounds, he also had regained approximately twenty pounds after changing physicians. Further, there was proof that Plaintiff's husband continued all his activities, including his work, up until the day he died. Additionally, Plaintiff's testimony was directly contrary to Gross' testimony concerning which of the questions contained in the application Gross actually asked of her. The jury was at liberty to believe or disbelieve that testimony, and it chose to credit Plaintiff's testimony.

It is American Heritage that made the determination to allow Plaintiff to furnish her spouse's medical history for the insurance application and, in fact, sign her spouse's name to the application. This being so, what is relevant on the issue of misrepresentation is not what knowledge Mr. Ginn had concerning his health, but rather what knowledge Plaintiff had concerning her husband's health. Accordingly, we conclude that there was substantial and material evidence to support the jury's verdict when it found that Plaintiff did not make any material misrepresentations concerning her husband's health when applying for his life insurance.

We next address whether the Trial Court erred when it charged the jury on Defendants' misrepresentation defense. The issue of whether a jury instruction was proper is a question of law and is reviewed *de novo* without a presumption of correctness. *See Owens v. Methodist Health Care Systems*, No. 02A019704-CV-00089, 1999 Tenn. App. LEXIS 359, at **4, 5 (Tenn. Ct. App. June 7, 1999). In *Owens*, we stated that "we consider the charge as a whole to determine whether prejudicial error has been committed. The charge will not be invalidated so long as it fairly defines the legal issues involved in the case and does not mislead the jury." *Owens*, 1999 Tenn. App. LEXIS 359, at * 5 (quoting *Hunter v. Burke*, 958 S.W.2d 751, 756 (Tenn. Ct. App. 1997)).

Defendants' primary disagreement with the jury instruction given by the Trial Court is that it relied on language from *Gatlin v. World Service Life Ins. Co.*, 616 S.W.2d 606 (Tenn. 1981), as opposed to what Defendants believe to be the more factually analogous *Broyles v. Ford Life Ins. Co.*, 594 S.W.2d 691 (Tenn. 1980). In *Gatlin*, our Supreme Court distinguished its earlier opinion in *Broyles* by stating:

> In this Court's recent decision of *Broyles v. Ford Life Insurance Co.*, 594 S.W.2d 691 (Tenn. 1980), the Court was faced with a situation involving a term life insurance policy in which the insured had stated that he was in "good health." In that case the insured had been under treatment for leukemia; the treatment caused him to experience blurred vision, headaches, stomach disorders, and rendered him unable to take some medication. He was undergoing frequent tests and although the treating physician would not say that he specifically told Broyles that he had "leukemia," he testified that Broyles positively knew he had a medical problem. There was a concurrent finding by the trial court and the intermediate appellate court that Broyles did not know he had leukemia, but this Court found, as a matter of law, that he had misrepresented the state of his health, based upon the overwhelming evidence that he knew he had a serious medical problem. Another important distinction between the Broyles case and the present one is that in Broyles the application form contained a place for exceptions or limitations on the general statements of health where it was indicated that applicants should qualify the assertion of "good health," if appropriate. Thus, it was much more evident in that case that the insurance carrier was relying on the fact of "good health" rather than the mere representation or opinion of such status.

*Gatlin*, 616 S.W.2d at 610-11.

We do not believe *Broyles* is applicable for two reasons. First, we have already concluded that Mr. Ginn's health, unlike Mr. Broyles' health, was not such that we are required to conclude, as a matter of law, that Plaintiff made a misrepresentation when she said Mr. Ginn was in "basic good health." As already concluded by us, there was substantial and material evidence to support the jury's verdict in finding that Plaintiff did not make any material misrepresentation concerning her husband's health when applying for her husband's life insurance. Second, in *Broyles* the application contained a "place for exceptions and limitations on the general statements of health…." Here, Plaintiff testified she never saw the application completed by Gross on his laptop computer, and that Gross never inquired further about her husband's health other than asking if he smoked, had AIDS, or was in basic good health. When considering the Trial Court's charge to the jury as a whole, we cannot conclude that the Trial Court committed reversible error when it relied

more heavily on *Gatlin* than *Broyles* when charging the jury on the defense of misrepresentation given the facts as presented to the jury.

The claimed misrepresentation was the only defense relied upon by Defendants when denying Plaintiff's claim. Having affirmed the verdict and the resulting judgment that Plaintiff did not materially misrepresent her husband's health, it necessarily follows that we will not disturb the jury's finding that there was a breach of contract.

The statute upon which Plaintiff was awarded a 25% bad faith penalty is Tenn. Code Ann. § 56-7-105(a), which provides as follows:

> The insurance companies of this state … in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105(a) is penal in nature and must be strictly construed. *See Stooksbury*, 126 S.W.3d at 519 (citing *Minton v. Tennessee Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 38 (Tenn. Ct. App. 1992)). In order to recover bad faith penalties under this statute, a plaintiff must prove: "(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith." *Stooksbury*, 126 S.W.3d at 519. The burden of proving that an insurance company acted in bad faith in refusing to pay a claim lies with Plaintiff herein. *Id*; *see also Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978). In *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982), this Court explained that:

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. *An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a*

*defense and the defense was made in good faith, the statute does not
permit the (sic) imposing of the bad faith penalty.*

*Sisk*, 640 S.W.2d at 852 (emphasis in original)(quoting *Nelms v. Tennessee Farmers Mutual Ins. Co.*,
613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)).

The jury's verdict awarding a bad faith penalty can be set aside only if there is no
material evidence to support it. Tenn. R. App. P. 13(d); *Forrester v. Stockstill*, 869 S.W.2d 328, 329
(Tenn. 1994). However, the verdict cannot be based upon a "mere spark, glimmer, or scintilla of
evidence." *See Stooksbury*, 126 S.W.3d at 519 (quoting *Sadek v. Nashville Recycling Co.*, 751
S.W.2d 428, 431 (Tenn. Ct. App. 1988)). In our opinion, Defendants had substantial legal grounds
supporting their position that Plaintiff materially misrepresented her husband to be in "basic good
health" when applying for the life insurance. This is readily apparent given Mr. Ginn's troubled
medical history. Defendants simply unsuccessfully asserted the misrepresentation defense. We find
no material evidence whatsoever to support the jury's conclusion that this defense was asserted in
bad faith. Accordingly, we reverse the judgment of the Trial Court insofar as it awards Plaintiff a
bad faith penalty of 25%. *See Stooksbury*, 126 S.W.3d at 519 (reversing a 25% bad faith penalty
after concluding the defendant had substantial legal grounds supporting its position that the
plaintiffs' insurance coverage had been cancelled prior to the date of loss). *See also Sisk v. Valley
Forge Ins. Co.*, 640 S.W.2d 844, 852 (Tenn. Ct. App. 1982)("There were substantial legal grounds,
though not sustained, for the insurer to defend herein. Therefore, we believe the finding of bad faith
must be overturned."); *Nelms v. Tennessee Farmers Mutual Ins. Co*, 613 S.W.2d 481, 484 (Tenn.
Ct. App. 1978) (Reversing the jury's award of a 25% bad faith penalty after concluding there were
"valid reasons for the insurance company to question the loss. Further, we think the insurance
company honestly and in good faith believed … its policy was not liable for the loss. For the above
reasons we think there is no material evidence to support a finding of bad faith and the invoking of
the statutory penalty.").

Defendants claim the Trial Court erred in not directing a verdict in their favor on
Plaintiff's TCPA claims. They also raise the related issue of whether Plaintiff even stated an
actionable claim under the TCPA. We will quote the Trial Court's entire charge to the jury on this
claim:

> The plaintiff claims that defendant used the following unfair
> or deceptive acts or practices that violate the Tennessee Consumer
> Protection law: Tennessee Code Annotated 47-18-104(12).
> Representing that a consumer transaction confers or involves rights,
> remedies or obligations that it does not have or involve or which are
> prohibited by law; Tennessee Code Annotated 47-18-104(14).
> Causing confusion or misunderstanding with respect to the authority
> of a salesperson, representative or agent to negotiate the final terms
> of a consumer transaction; Tennessee Code Annotated 47-18-104(27).

Engaging in any other act or practice which is deceptive to the consumer or to any other person.

If you find that the plaintiff has proven by a preponderance of the evidence that the defendant used any one or more of these acts or practices, then defendant has violated the Tennessee Consumer Protection Law.

The plaintiff is entitled to actual damages for any loss of money, property, or thing of value that was caused by the defendant's use of the unfair or deceptive acts or practices.

As we noted in *Stooksbury*, the "stated purpose of the TCPA is to 'protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state.'" *Stooksbury*, 126 S.W.3d at 520 (quoting Tenn. Code Ann. § 47-18-102(2)). We also noted in *Stooksbury* that the TCPA applies to insurance companies. We stated:

The applicability of the TCPA to insurance companies was recently discussed by our Supreme Court in *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998). In *Myint*, the plaintiffs brought suit after Allstate refused to pay on a claim due to the suspicious nature of the cause of two fires which ultimately resulted in substantial damage to the plaintiffs' property. It was stipulated by the parties that both fires were set intentionally, but the plaintiffs steadfastly denied that they set the fires. *Id.* at 923. The main issue to be decided by the Supreme Court was whether the TCPA was applicable to insurance companies. The Court held that it was, concluding the legislature intended the TCPA to be complementary to other statutes regulating the insurance industry. After reaching this result, the Court then decided whether the denial of the plaintiffs' insurance claim constituted a violation of the Act. The Court stated:

While the sale of a policy of insurance easily falls under this definition of "trade" and "commerce," we conclude that Allstate's conduct in handling the Myints' insurance policy was neither unfair nor deceptive. The record reveals no evidence of an attempt by Allstate to violate the terms of the policy, deceive the Myints about the terms of the policy, or otherwise act unfairly. It is apparent that the denial of the Myints' claim was Allstate's reaction to circumstances which Allstate believed to be suspicious. Consequently, Allstate's conduct does not fall within the purview of the Tennessee

-12-

> Consumer Protection Act, and the Myints are not entitled to the benefits of treble damages and attorney's fees recoverable under the Act.

*Stooksbury*, 126 S.W.3d at 520 (quoting *Myint*, 970 S.W.2d at 926).

Here the jury was not asked to state what conduct by Defendants it believed to be unfair or deceptive. Instead, the jury simply was asked whether Defendants had engaged in deceptive or unfair acts in violation of the TCPA. In her brief on appeal, Plaintiff lists certain conduct which she believes supports the jury's verdict on this claim. For example, Plaintiff claims Defendants violated the TCPA simply because they took the application for insurance "from piecework employees trying to make production at their workstations…." Plaintiff also claims the manner in which Gross took the application was a violation of the TCPA, such as when he failed to read Plaintiff the questions contained on the application. What Plaintiff overlooks is that she seeks the benefit of all this alleged conduct when she claims that she had a valid contract of insurance, successfully we might add.

Plaintiff also claims the Defendants' denial of her claim violated the TCPA. Plaintiff claims, among other things, that the denial of her claim was unfair and deceptive because Mr. Ginn's medical records were not reviewed by a physician or someone with medical training. We fail to see how this even remotely states a cause of action under the TCPA.

Plaintiff's husband had a valid life insurance contract, and Defendants have never questioned that with the sole exception being whether Plaintiff made material misrepresentations about her husband's health. Today we reach the same ultimate conclusion reached by this Court in *Stooksbury* and by our Supreme Court in *Myint*. We conclude there was no unfair or deceptive conduct by Defendants when the insurance contract was entered into; there was no unfair or deceptive conduct by Defendants when handling Plaintiff's claim; there was no evidence of an attempt by Defendants to violate the terms of the policy; and Defendants had substantial legal grounds to support their defense to Plaintiff's claim for benefits.[3] After reviewing the entire record in this case, we conclude there is no substantial or material evidence upon which the jury could have concluded Defendants violated the TCPA. In short, Plaintiff got exactly what she bargained for – a $50,000 life insurance policy on her husband. The only reason American Heritage claimed Plaintiff was not entitled to the proceeds was its good faith belief, albeit mistaken, that Plaintiff materially misrepresented her husband's health. Finding no substantial and material evidence

---

[3] Plaintiff apparently anticipated American Heritage was going to claim that Gross improperly allowed Plaintiff to sign the application on her husband's behalf. At trial Plaintiff testified to an alleged conversation she had with Gross where he supposedly told Plaintiff to say her husband actually did sign the application. Assuming for present purposes only that Gross misrepresenting to Plaintiff that she had authority to sign the application on her husband's behalf would or could be a violation of the TCPA, the facts in this case do not support such a claim and it should never have been an issue at trial. Both Gross and American Heritage unequivocally testified that Gross was authorized to have Plaintiff sign the application on her husband's behalf. More importantly, Defendants did not deny Plaintiff's claim on that basis and never made that argument either before or at trial.

-13-

anywhere in the record to support a verdict for Plaintiff pursuant to the TCPA, we reverse that portion of the Trial Court's judgment. We likewise reverse the award of attorney fees pursuant to the TCPA. In light of this holding, we pretermit Plaintiff's claim that the Trial Court erred in forcing her to elect between remedies, and that it further erred by not awarding her all the attorney fees she requested.

Defendants' final issue surrounds whether or not certain evidence should have been admitted. More specifically, Defendants claim the Trial Court improperly allowed Plaintiff to testify about the statements of Mr. Ginn's physician following the March 22, 1999, colonoscopy wherein the physician told Plaintiff "everything looked fine." Defendants also claim the Trial Court improperly refused to allow them to impeach one of Plaintiff's witnesses via inconsistent statements contained in an affidavit. We review these evidentiary determination under the abuse of discretion standard. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn.1992) (holding "admissibility of evidence is within the sound discretion of the trial judge").

Tenn. R. App. P. 36(b) provides that a "final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." This Court has reviewed all of the evidence in this case and the entire record. Even if Defendants are correct that these evidentiary rulings by the Trial Court were incorrect, we nevertheless conclude that such rulings did not involve a substantial right that more probably than not affected the jury's verdict or the judgment as amended by this Court. Therefore, even if these rulings were incorrect, Defendants would not be entitled to a new trial.

After the jury rendered its verdict, the Trial Court required Plaintiff to choose between the remedies available under the breach of contract claim or the remedies available under the TCPA. Since we reversed the judgment insofar as it awarded any damages under the TCPA, we must necessarily reinstate the jury's verdict awarding Plaintiff compensatory damages for breach of contract in the amount of $50,000, the policy value. Defendants do not challenge the award of prejudgment interest or discretionary costs, and we affirm those aspects of the judgment. The Judgment of the Trial Court is affirmed insofar as it awards Plaintiff $50,000 in compensatory damages, $21,561.64 in prejudgment interest, and $1,853.51 in discretionary costs, bringing the total judgment to $73,415.15.

## Conclusion

The Judgment of the Trial Court is affirmed in part and reversed in part. Specifically, the judgment of the Trial Court is modified so as to award Plaintiff $50,000 in compensatory damages, $21,561.64 in prejudgment interest, and $1,853.51 in discretionary costs for a total judgment of $73,415.15. This case is remanded to the Trial Court for collection of the costs below. Costs on appeal are assessed one-half against the Appellants American Heritage Life Insurance Company and Daryle W. Gross, and their surety, and one-half against the Appellee Pamela K. Ginn.

_____
D. MICHAEL SWINEY, JUDGE